# Sinkovich *v.* Bell Telephone Co. of Pennsylvania, Appellant.

*Negligence—Telephone company—Wires—Lightning—Evidence —Experts—Act of God—Causal connection—Arrestor.*

1. The mere leaving of telephone wires on a house after disconnection of service is not negligence.

2. In an action against a telephone company to recover for the death of plaintiff's husband, where it appears from plaintiff's own testimony that the deceased was killed by a stroke of lightning,— an act of God,—she must go further and produce affirmative proof of negligence on the part of the defendant which concurred with the act of God and effectively contributed to the accident. Rocap v. Bell Tel. Co., 250 Pa. 597, followed.

3. A telephone company cannot be charged with negligence in failing to protect a telephone from lightning, where no proof is produced to show that there is at present any known device which

will prevent the discharge of powerful electric bolts from a telephone wire.

4. Where it is alleged that a death was caused by lightning carried along a telephone wire, the causal connection, between the injury alleged and the subsequent death, must be proved, not as a possibility, or as something that might have resulted, but the experts must testify, if recovery is to be allowed, that in their opinion the result in question did come from the cause alleged.

5. If the opinion of highly qualified electrical experts is that there was not a scintilla of evidence of any electrical discharge from defendant's wires or poles to the house of the deceased, and that decedent was killed by an independent stroke of lightning, with which the wires on his house had nothing to do, it is error to submit the case to the jury.

6. If the causal connection between the bolt on the wires and death is left in doubt, the case cannot be submitted to the jury.

7. If it is claimed that an arrestor might have prevented the accident, such claim is futile, if it appears that, even if the bolt had been on the wires, it would have left them before it reached the arrestor, and the arrestor would therefore not have safeguarded the deceased.

*Evidence—Witness—Expert—Qualifications.*

8. A witness is not qualified to express an opinion, as an electrical expert, as to the effects of lightning, where he admits that he has had no experience with lightning or its effects, and it appears that he had little or no scientific training or knowledge, and that all he knew on the subject of electricity and its actions was what he had learned from his own experience as a workman.

Argued April 12, 1926.  Before MOSCHZISKER, C. J., FRAZER, WALLING, SIMPSON, KEPHART, SADLER and SCHAFFER, JJ.

Appeal, No. 82, Jan. T., 1926, by defendant, from judgment of C. P. Clearfield Co., Sept. T., 1922, No. 277, on verdict for plaintiff, in case of Anna Sinkovich, by her father and next friend, Anthony Stanovich, v. Bell Telephone Co. of Pennsylvania.  Reversed.

Trespass for death of plaintiff's husband.  Before CHASE, P. J.

The opinion of the Supreme Court states the facts.

Verdict and judgment for plaintiff for $10,000.  Defendant appealed.

*Error assigned* was, inter alia, refusal of motion for judgment n. o. v., quoting record.

*John C. Arnold,* with him *William H. Lamb,* for appellant.—Thompson was not qualified as an expert.

The real expert of plaintiff would go no further than to say that it would be possible for the man to be so killed.

The doctrine of res ipsa loquitur could not apply, there being no contractual relation between the parties. There could be no presumption of negligence: Nichol v. Bell Tel. Co., 266 Pa. 463; Nixon v. Pfahler, 279 Pa. 377; Fitzpatrick v. Penfield, 267 Pa. 564.

Plaintiff must establish by the weight of the evidence both the cause of the accident, and that it resulted from the negligence of defendant: McCrosson v. P. R. T., 283 Pa. 492.

*Singleton Bell,* with him *A. M. Leveright,* for appellee.—The case was for the jury: Daltry v. Electric Light Co., 208 Pa. 403.

The decisions in Pennsylvania have held inflexibly to a requirement of great care as to wires by which dangerous currents of electricity may be transmitted to the injury of some one; and have always held that the measure of duty is care proportionate to the danger: Herron v. Pittsburgh, 204 Pa. 509; Daltry v. Electric Co., 208 Pa. 403; Alexander v. Light Co., 209 Pa. 571; Ridgeway v. Electric Co., 258 Pa. 400; Donnelly v. Electric Co., 258 Pa. 580; Dillon v. Light Co., 179 Pa. 482.

OPINION BY MR. JUSTICE SCHAFFER, May 26, 1926:

This action was brought by plaintiff to recover damages for the death of her husband, who was killed by a bolt of lightning while standing in front of a window in their home. The trial resulted in a verdict in plaintiff's favor. Defendant appeals and submits for our con-

sideration, in support of the claim that judgment should be entered in its behalf, that there was no sufficient evidence to sustain the jury's finding of negligence and no adequate proof of the causal connection between the negligence alleged and the death.

It is necessary to an understanding of the legal questions involved to depict the situation at the time of the tragedy. Defendant maintained a telephone line along a public highway in the vicinity of the house occupied by plaintiff and her husband. While a rain storm was in progress in the late afternoon of July 11, 1921, pole 105 in the line was struck and shattered by a severe bolt of lightning. A witness called by plaintiff testified that he saw the pole struck and instantly thereafter observed a light on the wire which led from it toward the house occupied by decedent. The wires which were in a twisted strand ran in a northerly direction, substantially at right angles from the pole, a distance of about 270 feet to the corner of a house designated in the testimony as No. 24. At this corner the wires divided, one set going westerly along the rear of house No. 24 and also along the rear of plaintiff's house, designated as No. 25, and the other in a northeasterly direction to a house designated as No. 34. Several years before the time of the occurrence with which we are dealing, a telephone had been set up in house No. 25. No telephone had been located therein for at least five years prior to the accident, but the wires had been permitted to remain suspended along the outside of the house, which was of frame, and through its wall, being carried through in porcelain tubes with the ends of the wires exposed and hanging out of the tubing in the room in which decedent met his death.

It is the contention of defendant that this wire which passed along house 25 was not connected with the wire which ran from pole 105, but was a severed loop. We are not at this stage of the case concerned with this allegation, as there was testimony in plaintiff's behalf that

the connection existed.  The wire, so far as house 25 was concerned, was supported by a nail driven in the weatherboarding.  The woodwork of the house where the wire came in contact with it was wet.  The wire was not grounded.  The wire which branched off from the corner of house 24 to house 34 was connected with a telephone in the latter.  This wire was grounded by means of an arrester device composed of carbons with an air gap of 3/1000ths of an inch between them from which a wire ran to the ground.  This is the usual device to protect telephones, so far as practically possible, from excess electrical currents.  These carbons, when examined after the accident, indicated that no electric current had passed through them.  It appeared, however, that the telephone was out of use following the storm and that at the time of the lightning stroke there was a jingle of its bell.

Decedent while the storm was in progress was in the room in house 25, where the wires protruded through the wall.  He walked to a window near the wires and raised his hands toward the shade.  In so doing he stood close to a metal sink from which an iron pipe ran to the ground.  As he attempted to reach the shade, there was a violent flash of lightning and he fell over dead, with burns on his body showing that he had been electrocuted.  The lightning did not enter the room from the exposed ends of the wires, but, if it came along the wires, jumped from them several feet before reaching the place where they entered the wall, to a point above the window, in front of which decedent was standing, tearing a hole through the woodwork of the house, through the plaster and the wallpaper.  The theory of plaintiff is that the electrical current jumped from the wire where it came in contact with the wet wall, forced its way through it, jumped to decedent's body and from it to the metal sink, whence it was grounded through the pipe leading to the earth.  The insulation on the wire was not burnt or bursted, although it had deteriorated somewhat from

age and contact with the house and was worn. The wire itself was not melted or otherwise affected. Another wire attached to pole 105 was found, after the storm, to have melted through and broken.

Plaintiff relies for her right to recover on the fact that pole 105 was struck, that the wire ran from this pole to decedent's house, that a light was seen on this wire following the flash of lightning, that it was negligence to have allowed this wire to remain hanging on the house after the telephone therein was removed and particularly so without grounding it. Defendant sets up that there is no sufficiently satisfying proof that the bolt of lightning which struck pole 105 is the one which killed the decedent, that his death was under all the probabilities due to a secondary lightning stroke instantaneously following the one which hit pole 105, a recognized phenomenon in electrical storms, which latter stroke hit decedent's house direct. It is urged upon us that the mere leaving of the wire could not be declared negligent and that the failure to have it grounded where it entered the house is of no consequence in the determination we are to reach, as the electric current, if it was on the wire, jumped from it before reaching the point where the ground wire would have been placed and therefore the failure to ground is an immaterial matter.

Starting then with the admitted fact that pole 105 was struck, we have as the next link of the chain of proof that the witness Rasemus said he saw a light on the wire leading from the pole to decedent's house. He testified that he saw light on the pole when it was struck as well as on the wire leading to decedent's house; that the light was like a blaze, a fire when it hit the pole and was on the wire for a distance of about six feet from the pole. These facts coupled with that of the death by electrocution are the ones upon which appellee relies to connect the lightning stroke with the death and are sought to be supplemented by the testimony of "experts" to establish defendant's liability therefor. One

of these witnesses, F. J. Thompson, could not be so de-
nominated by the greatest straining of the term expert
witness and yet appellee places much reliance upon him.
He described his business as "real estate and electric"
and his experience as "electric wiring, outside trans-
missions, some telephone, power house," gained while
employed by two electric companies, and in the electric
supply business on his own account. He said he was
familiar with electric currents and electric construc-
tion but did not know the voltage used on telephone cir-
cuits. He defined high electric currents as "anything
that will knock you down," "something that you can't
handle by your hands." He knew that electricity seeks
the ground. He did not know whether electric currents
of high voltage will pass through porcelain insulators.
His attention being directed to lightning, his thought
was "lightning you can't handle I don't think." Asked
as to the kind of conductor that the human body is, he
replied he could not tell. Interrogated as to whether he
had ever had occasion to determine the effect of metal on
the course of an electric current, he answered that he
had not, but added that when it hits a tin roof it gen-
erally goes to the ground. Asked as to the conductivity
of damp air, he said he never had occasion "to try that
out." Speaking of the rubber and fabric insulation on
telephone wires, he "guessed" it is "partly protection,
and wants to keep the wires separate from the ringing
power and talking." Asked as to whether, if lightning
arced through wood and into plaster, then into the air
and into a human body and then was grounded, it would
leave a mark on the wire, he replied that "lightning is
uncertain," that he never had a whole lot of experience
with it. Asked what an electric arc is, he answered
"The arc is the flash." Asked as to what lightning is, he
replied "I couldn't tell you that. It burns, I know that.
There must be some electric to it." He admitted that he
had had no experience with lightning or its effects.
Asked whether a high potential electric current will not

take the course of least impedence, he answered "I don't understand," and, upon the inquiry being altered to "least resistance," he said "I don't know what you mean." In ascertaining what if any scientific knowledge the witness had on the subject of electricity, it was developed that his general education had been meagre, that he had heard a few lectures given by employees of one of the companies for which he had worked, that he could not recall the name of any book on the subject which he had read, that he had two sets of books relating to it, one in six volumes, and one in twelve, but he could not remember the names of the books or the author. It is obvious from the foregoing review of this witness's qualifications that he was not an expert, that all he knew on the subject of electricity and its actions was what he had learned from his own experience as a workman and that his expressions of opinions on the highly scientific subjects, as to which he was interrogated and which went to the heart of the case, were valueless and that nothing could with certainty or safety be predicated on them.

In defendant's behalf two trained specialists on the subject of electricity were called. They did not alone express opinions as opinions but stated certain scientific facts. These two witnesses were Charles L. Kinsloe, head of the department of electrical engineering at Pennsylvania State College, a member of the American Institute of Electrical Engineers, and W. R. Work, head of the department of electrical engineering at Carnegie Institute of Technology, also a member of the American Institute of Electrical Engineers. They each testified that there can be no such thing as a single stroke of lightning owing to the necessity of maintaining the electrical equilibrium or balance in the clouds, that the secondary discharges are not necessarily, but may be, to the earth or may be between adjacent clouds and that these independent strokes can be of greater or less severity than the initial one and can come with such

rapidity that the eye and ear cannot distinguish them from the primary flash. They said that the bolt which struck pole 105 was grounded by it, that there could be no induced current on the line of wire which ran from pole 105 to decedent's house, because those wires were at right angles to the ones on the poles and induced current is created only on parallel wires, that had there been a charge of electricity on the circuit from pole 105 to houses 24, 25 and 34, it would have discharged through the carbon arrestor at house 34, and the arrestor showed that no current had passed through it or on the line running from pole 105 to the three houses, that under the circumstances it would not have been possible for the bolt of lightning which struck pole 105 to have been transmitted to the wires on decedent's house. They also testified that if the wires which extended from pole 105 to decedent's house had received either a primary or induced charge of lightning there would be no visible manifestation of light on the wires unless the current were sufficient in strength to heat the wire to incandescence, and if it was sufficient to do this, it would have burned the insulation and unless the disturbances were very brief would have melted the wire. There was no dispute that the wire was not melted and the insulation not burned. It was explained that if the witness, who testified that he was looking at the pole at the time it was struck, and who said that he saw the light on the wire, did see the pole struck, his eyes were subjected to an intensity of light which the optic nerve could not receive and continue to function normally, one effect of which would be to create an image on the brain of the original light source which would persist, an optical illusion. They stated, after having heard all the testimony in the case, that there was no evidence, not a scintilla, which showed that there had been any electrical discharge of lightning on the loop from pole 105 to decedent's house. It was the opinion of these witnesses that the decedent was killed by an independent stroke

of lightning, with which the wires on his house had nothing to do.

Charles D. Cushing, an electrical engineer by profession, called by plaintiff in rebuttal, being asked the question if a heavy discharge of lightning hit pole 105 whether, under the circumstances shown, it would have been possible for it to have traveled along the wires to decedent's house and killed him, answered on direct examination that it would be possible. On cross-examination, he qualified his answer by saying that with the arrestor at house 34, it would not in his opinion be probable and that the possibility would be very slight, that if the ground rod at house 34 was in damp earth it would be practically impossible. The evidence disclosed that the ground rod was outside the house and that it had been raining very hard.

Under the foregoing testimony epitomized from the record, it is our conclusion that it was not established that decedent's death was due to the stroke of lightning which hit pole 105, and consequently the question as to the causal connection between the bolt and the death was left in such doubt that it should not have been submitted to the jury. We have said in compensation cases, where the law is most liberally construed in favor of claimants, that the causal connection between the injury alleged and disablement or death must be proved, not as a possibility or as something that might have resulted and that the expert must, if recovery is to be allowed, testify that, in his opinion, "The result in question did come from the cause alleged": McCrosson v. Phila. Rapid Transit Co., 283 Pa. 492. A further circumstance in the case which has weight in its determination is that even if there had been an arrestor on the wires which led into house 25, this arrestor would not have safeguarded the decedent, provided the bolt of electricity was on the wires, because it left them before it would have reached the arrestor. If the proofs in the case had shown that the electric current had left the exposed ends of the wire

and entered decedent's body, then another legal situation might be created, but the proofs are otherwise without contradiction. We think it could not be safely laid down as a rule of law that the mere leaving of telephone wires on a house is negligence. If this rule were to be established, telephone companies would be required in every instance where a telephone is removed to take their wires away.

We have discussed the case up to this point along the lines on which it was tried in the court below and presented in printed briefs and oral arguments before us. Neither in the opinion of the court below nor in the briefs of counsel here is there any reference made to the case of Rocap v. Bell Telephone Co., 230 Pa. 597, which is the only appellate court decision in this jurisdiction, so far as our own research has developed, in which lightning was alleged as the cause of damage from telephone wires. In that case, Mr. Justice MESTREZAT, speaking for the court, pointed out that "The doctrine of the electric light and power cases cited by the plaintiff is not applicable to the facts of the present case" and that "The distinction between the two classes of cases is, we think, apparent, and certainly very important." In the pending case, it is only these cases which are cited to us. In the instant case, there is no evidence in the record to show that if an arrestor had been on the wire along house 25 it would have diverted the powerful lethal current from decedent's body and no evidence to show that there are practicable arresters now known and in use which were not known in 1911, when that case was decided. There it was shown that the company had placed a device on the wire to prevent the discharge into the telephone of electric currents during an electrical storm. Witnesses having experience and technical knowledge testified that it was the standard protection device, the best in general use and the most efficient known to the scientific world for protecting a telephone from light-

ning.  The witnesses concurred in saying that there was no known device which would absolutely prevent lightning disturbances entering a telephone. · In the instant case, there was no testimony produced to show that there is now a known device which will prevent the discharge of powerful electric bolts from a telephone wire.  In the Rocap Case we determined (page 602) "The maxim res ipsa loquitur does not apply to the facts of the case as disclosed by the plaintiff's evidence." It was pointed out that if the plaintiff had simply proved the accident and the consequent injury without more, a prima facie case might have been made out under the authorities "But the plaintiff went beyond the mere proof of the accident, and showed the cause of it......It pointed conclusively to one cause......and that was the act of God.  The testimony of......plaintiff's witness leaves no rational doubt that the shock received by the plaintiff......was produced by atmospheric electricity and not by an electric current within the control of man......It appearing by the plaintiff's testimony that his injuries resulted from the act of God.....the burden was therefore on the plaintiff to produce affirmative proof of negligence which concurred with the act and effectively contributed to the accident.  To create a liability on the part of the defendant it must have required the combined effect of the act of God and the concurring negligence to produce the injury......and if the act was so overwhelming as of its own force to produce the injury independently of the negligence shown,. the defendant cannot be held responsible." In the light of this case, we think plaintiff's proofs, entirely aside from those of defendant, were utterly inadequate to warrant a recovery. · We are, therefore constrained to sustain appellant's assignments of error.

The judgment of the court below is reversed and the record is remitted with directions to enter judgment for defendant.